Jared Allebest, #13485
Attorney for Plaintiffs
8978 South Quarry Stone Way
Sandy, UT 84094
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MCCALL SCADLOCK, an individual ASHLEY KINDRED, an individual, and Roes I-X <br><br> Plaintiffs, <br><br> vs. <br><br> INTERMOUNTAIN HEALTHCARE an organization, PRIMARY CHILDREN'S HOSPITAL, an organization, LEHI CLINIC AND INSTACARE, an organization, ASL COMMUNICATIONS, an organization, and ROES I-X. <br><br> Defendants. | COMPLAINT <br><br> Civil No. <br><br> Judge <br><br> Jury Trial Requested |

MCCALL SCADLOCK (hereinafter "Ms. SCADLOCK") and ASHLEY KINDRED (hereinafter "Mrs. KINDRED"), by and through their attorney JARED M. ALLEBEST of the Allebest Law Group, hereby submits the following:

**PRELIMINARY STATEMENT**

1.      McCall Scadlock and Ashley Kindred, the Plaintiffs, are individuals who are Deaf and who is bilingual in English and American Sign Language.  They do not wear hearing aids or cochlear implants of any kind. On one or more occasions, the Defendants failed, or refused, to provide the requested accommodations for one or more of the Plaintiffs.

1

2.      Defendants, jointly and severally (including various agencies and divisions), lease and operate places of "Public accommodation" for purposes of 42 U.S.C. § 12132 and the implementing regulations, 28 C.F.R. § 36.104.

3.      The Defendants (including their various agencies and divisions) are obligated by Title III of the ADA to ensure that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." §28 CFR 36.201

4. ADA specifically states that the public accommodation such as the Defendants "shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." 28 C.F.R § 36.202 "Activities."

5. The Defendants "shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control." ASL Communication (ASLC) is subject to common administrative control by Intermountain Health Care (IHC) by contract

and by the fact that ASLC must abide by IHC's policies, practices and procedures because they have been hired to provide ASL interpreting services to patients who are Deaf or hard of hearing. 28 C.F.R. § 36.204 "Administrative methods."

6.      The Defendants failed to establish within their agencies and divisions, policies, practices, and procedures required under the ADA to ensure that persons who are Deaf are not subjected to discrimination. If such policies do exist, the Defendants (including all various agencies and divisions) failed to assure that agents, and/or its other agents, are aware of the policies and/or are properly trained to follow and practice the procedures such policies would mandate. Furthermore, the Defendants' illegal methods of administration over their respective programs and/or personnel tend to exclude and segregate people with disabilities from the benefits of public programs or services.

7.      The ADA is a legislative response to the fact that "historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

8. The Defendants failed to establish within their agencies and divisions, policies, practices, and procedures required under the ADA and Section 504 to ensure that persons who are Deaf, are not subjected to discrimination. If such policies do exist, the Defendants (including all various agencies and divisions) failed to assure that agents, and/or its other agents, are aware of the policies and/or are properly trained to follow and practice the procedures such policies would mandate. Furthermore, the Defendants' illegal methods of administration over their respective programs and/or personnel tend to exclude and segregate people with disabilities from the benefits of public programs or

3

services.

9. Deaf persons are protected by the Americans with Disabilities Act not only as patients, but also as companions to patients who are seeking treatment. 28 C.F.R. § 36.303(c)(1).

10. Under the ADA, Video remote interpreting (VRI) service "means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images." 28 C.F.R. § 36.104 "Video Remote Interpreting"

11. A public accommodation that chooses to provide "qualified interpreters via VRI service shall ensure that it provides real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; a sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual´s face, arms, hands, and fingers, regardless of his or her body position; a clear, audible transmission of voices; and adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f)(1-4).

12. VRI equipment uses computer technology, a microphone, and a camera to provide remote access to an interpreter via the internet.

13. With VRI, although the medical personnel and the patient are all in the same room, the interpreter is not physically present. Rather, the interpreter participates via a remote video connection similar to Skype or Facetime.

14. Because sign language is a purely visual language, any interruption in the clarity or fluidity of the video feed interrupts VRI communication in the same manner that poor fidelity, static, or "cutting out" interrupts spoken telephone communication.

15. Sign language is a three-dimensional language, so any rendering on a two-dimensional screen by definition reduces the quality of communication.

16. Because the camera is pointed at the deaf participant, the VRI interpreter typically cannot see any of the non-deaf participants. Therefore, if more than one non-deaf participant is speaking during the interaction, the VRI interpreter faces the same barriers in understanding as are typically faced during a conference call, for example, difficulty identifying who is speaking, difficulty hearing people who are located too far from the microphone, and background noise interfering with the intelligibility of the person speaking.

17. On-site sign language interpreters carry no risk of such technical problems because they do not rely on technology to provide services.

18. Further, all sign language interpreters abide by a strict code of professional conduct, mandating that interpreters maintain a high level of confidentiality in all aspects of their work.

19. In this case, the Defendants utilized VRI to provide communication to the Plaintiffs, even when VRI is not the preferred format, seldom works appropriately, and not effective due to the sensitive nature, length, and complexity of the communication involved; and the context in which the communication is taking place. The VRI device at Primary Children's Hospital and/or the Lehi Clinic and Instacare often did not function or functioned poorly, causing communication to be ineffective or break down entirely.

20. Defendant's duties under the ADA are mandatory and long-established. Defendant is deemed to have had knowledge of its duties at all times relevant herein. Defendant's failure to carry out these duties as set forth herein was willful and knowing and/or the product of deliberate indifference.

21. Section 504 and its regulations require that any entity which receives federal funds to ensure that "no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity." 34 C.F.R. § 104.4 (a) Furthermore, the entity "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap" refuse "a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service" or "otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 34 C.F.R. § 104.4 (b)(1)(vi,vii)

22. Additionally, Section 504 and its regulations states that the Defendants "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap" refuse "a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service" or "otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 34 C.F.R. § 104.4 (b)(1)(vi,vii).

23. The Defendants violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its regulations when their agents, or employees, at various times and places

have refused to provide effective communication with a patient who is Deaf.

24. As a medical facility, Intermountain Health Care and its various medical facilities that owns, leases or controls "must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility." 42 C.F.R. § 483.75(b).

25. In addition, Intermountain Health Care is "obliged to meet the applicable provisions of other [Department of Health and Human Services] regulations, including but not limited to those pertaining to . . . nondiscrimination on the basis of handicap (45 C.F.R. part 84)." 42 C.F.R. § 483.75(c).

26. Defendants has violated Section 504 by denying the Plaintiffs, the benefits and services offered at Primary Children's Hospital and the Lehi Clinic and Instacare on the basis of their disability. 45 C.F.R § 84.52(a)(1).

27. The Defendants provided the Plaintiffs benefits and services that are not equal to those afforded non-disabled individuals. 45 C.F.R § 84.52(a)(2) and/or providing the Plaintiffs with benefits or services that are not as effective as the benefits or services provided to others. 45 C.F.R § 84.52(a)(3) It also provided benefits or services in a manner that limits or has the effect of limiting the participation of Plaintiff. 45 C.F.R § 84.52(a)(4) and/or providing different or separate benefits or services to Plaintiff, based on their disability. 45 C.F.R § 84.52(a)(5).

28. The Defendants failed to take such steps as are necessary to ensure that Plaintiff was not denied effective notice concerning the benefits or services offered at Primary Children's Hospital and/or the Lehi Clinic and Instacare because of their

disability. 45 C.F.R § 84.52(b).

29. The Defendants failed to establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care. 45 C.F.R § 84.52(c) and failing to provide appropriate auxiliary aids to Plaintiff, an individual with impaired sensory, manual and speaking skills, where necessary to afford her an equal opportunity to benefit from the services offered at Primary Children's Hospital and/or the Lehi Clinic and Instacare. 45 C.F.R § 84.52(d)(1).

30. Defendant's duties under Section 504 are mandatory and long-established. Defendant is deemed to have had knowledge of its duties at all times relevant herein. Defendant's failure to carry out these duties as alleged herein was willful and knowing and/or the product of deliberate indifference.

31. The Defendants failed to establish, within their agencies and divisions, policies, practices, and procedures required under The Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18001 et seq. to ensure that persons who are Deaf are not subjected to discrimination. Section 1557 of the Patient Protection and Affordable Care Act (ACA), ensures that an individual is not excluded from participating in, denied benefits because of, or subjected to discrimination as prohibited under Section 504 of the Rehabilitation Act of 1973 (disability), under any health program or activity, any part of which is receiving federal financial assistance, or under any program or activity that is administered by an Executive Agency or any entity established under Title I of the Affordable Care Act or its amendments. 42 USC 18116(a). This includes, but is not limited to, Meaningful Use funds or Medicaid funds.

32. Section 1557 requires covered entities to give "primary consideration" to the

person with a disability's choice of auxiliary aid or service. 81 Fed. Reg. 31421. Auxiliary

aids and services can include, as appropriate, qualified interpreters, a variety of assistive

technology devices, and the provision of materials in alternative formats. 45 C.F.R. § 92.4.

All covered entities, regardless of the number of employees, must provide appropriate

auxiliary aids and services to people with impaired sensory, manual, or speaking skills,

where necessary to afford those individuals an equal opportunity to benefit from the health

program or activity. 45 C.F.R. § 92.202(b).

## JURISDICTION AND VENUE

33.     This action arises under the law of the United States, including Title III of

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), 29 U.S.C. § 794a

("Section 504") and 42 U.S.C. § 18001 *et seq.* ("ACA"). The Court has jurisdiction over

this action under 28 U.S.C. § 1331 and 28 U.S.C. 1343(a)(3), as well as 42 U.S.C. §

12188(a) and 42 U.S.C. §12133, 29 U.S.C. § 794a and 42 U.S.C. § 2000d *et seq.* and 42

U.S.C. § 1983 for claims arising under color of law.

34.     Venue of this action is appropriate in the United States District Court for the

District of Utah, Central Division, pursuant to 28 U.S.C. § 1391(b) and (c) as the claim

arose in such district and, further, as the Defendants conduct business in such district.

## THE PARTIES

35.     MCCALL SCADLOCK is an individual who is Deaf and who is bilingual in

English and American Sign Language.   She wears hearing aids. On one or more

occasions, the Defendants failed, or refused, to provide the requested accommodations

for one or more of the Plaintiffs.

36. ASHLEY KINDRED, is an individual who is Deaf and communicates via

American Sign Language.  She does not wear hearing aids or cochlear implants of any kind.

37.     Intermountain Healthcare is a not-for-profit healthcare system and is the largest healthcare provider in the Intermountain West. Intermountain Healthcare provides hospital and other medical services in Utah and Idaho and also offers integrated managed care under the insurance brand SelectHealth. Intermountain Healthcare is headquartered in Salt Lake City, Utah, and has some 37,000 employees. Intermountain Healthcare has policies in place assuring patients with a hearing loss that they will be provided with effective communication upon request. (See Exhibit # 1).  Intermountain Healthcare owns and operates Primary Children's Hospital and the Lehi Clinic and Instacare which are public entities as defined by the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (RA) and the Affordable Care Act (ACA). Intermountain Healthcare Corporate and Executive Offices are located at 36 South State Street Salt Lake City, Utah 84111.

38. Primary Children's Hospital is a not-for-profit community focused health system operated by Intermountain Healthcare. It is a 289-bed hospital is equipped and staffed to care for children with complex illness and injuries. The Primary Children's Hospital is located at 100 Mario Capecchi Dr, Salt Lake City, Utah 84113

39. The Lehi Clinic and Instacare is a not-for-profit community focused health system operated by Intermountain Healthcare. The Lehi Clinic and Instacare is a state of the art clinic that is designed to help patients play an active role in their personal healthcare. It is located at 3249 North 1200 West Lehi, Utah 84043.

40. American Sign Language Communication, LLC is an interpreting agency that

provides American Sign Language (ASL) interpreters, C.A.R.T services, conference interpreting and video conference interpreting (VCI) in Nevada and Utah. Video Remote Interpreting (VRI) is where there is an internet-connected machine that pairs with a live ASL interpreter that is located remotely and communicates with the doctor and patient through a portable screen located in the hospital. It is believed that ASL Communications has an exclusive contract Intermountain Healthcare, Primary Children's Hospital and the Lehi Clinic and Instacare as well as other medical facilities operated by Intermountain Healthcare to provide ASL interpreters to patients with a hearing loss upon request. (See Exhibit # 2).  ASL Communication has an office located at 40 E. Horizon Ridge Parkway Suite 102 Henderson Nevada 89002 and at 1149 W. 640 N. Orem, Utah 84057.

41. Plaintiffs are informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venturer, parent, subsidiary, affiliate, related entity, partner, and/or associate, or such similar capacity, of each of the other Defendants, and was at all times acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission or ratification of each of the other Defendants, and is personally responsible in some manner for the acts and omissions of the other Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described.

**FACTS**

**ASHLEY KINDRED**

42.   Ms. Kindred's daughter had back surgeries at Primary Children's Hospital located at 100 Mario Capecchi Dr, Salt Lake City, Utah 84113 on February 9th, 2011, December 20th, 2011, April 3rd, 2017 and December 21st, 2017. Ms. Kindred was not provided an ASL interpreter on April 3rd, 2017 and December 21st, 2017 even though she had made a request for ASL interpreter two weeks in advance.

43. On or about around March 20th, 2017 Ms. Kindred contacted Primary Children's Hospital to request an ASL interpreter for herself in advance of her daughter's surgery on April 3rd, 2017.

44.   An ASL interpreter was not provided for Ms. Kindred while her daughter was in back surgery on April 3rd, 2017. Ms. Kindred was so upset about not being provided an ASL interpreter that she posted a video on social media in which she complained about not getting an ASL interpreter.[1]  She also made post on Facebook complaining about the lack of an ASL interpreter for her daughter during her surgery.[2] (Exhibit #3). Ms., Kindred was provided with an ASL interpreter only after the surgery was completed.



---

[1] Kindred, Ashley. https://share.icloud.com/photos/0Vgp-N7jBIVPSWycgqmz_PJjw#Primary_Children's_Hospital. Accessed on August 4, 2019
[2] Kindred, Ashley. Facebook post on April 3rd, 2017
https://m.facebook.com/story.php?story_fbid=10212701846439665&id=1191481160. Accessed on August 4, 2019

45. Sometime around April 7th, 2017, Ashley Kindred went with her daughter to the Primary Children's Hospital located at 100 Mario Capecchi Dr, Salt Lake City, Utah 84113. Ms. Kindred is Deaf, and her daughter is hearing. Ms. Kindred went to this hospital to resolve issues with her daughter's spinal fluids as well as to take a tour of the medical facility. Ms. Kindred requested an ASL interpreter prior to coming to that appointment and an ASL interpreter was provided for that meeting.

46. At the conclusion of that meeting and hospital tour, Ms. Kindred discussed with IHC staff members about making an appointment for my daughter's surgery and Ms. Kindred requested a live onsite ASL interpreter. She emphasized that she did not want VRI.  The lady who was doing the tour of the hospital agreed and wrote down my request for a live onsite ASL interpreter. Ms. Kindred left that meeting feeling confident that her request would be honored.

47. A few weeks later, Ms. Kindred came back to Primary Children's Hospital for her daughter's scheduled surgery on December 21st, 2017. Ms., Kindred came with her daughter as well as her husband, ex-husband and her mother.  Both Ms., Kindred's current husband and ex-husband are Deaf. The ex-husband came along because he is the biological father of Ms., Kindred's child. When Ms. Kindred arrived, the hospital provided me with an iPad with VRI on it. Unfortunately, the VRI was constantly freezing and disconnecting which was causing a major delay in the surgery.  Ms. Kindred was frustrated because she wanted to have a live onsite ASL interpreter so that Ms. Kindred and her current husband and ex-husband could communicate with staff and medical professionals[3].

_____

[3] Deaf persons are protected by the Americans with Disabilities Act, Rehabilitation Act and the Affordable Care Act

48. Ms. Kindred asked the front desk why she wasn't provided with an onsite ASL interpreter, and the IHC staff member at the front desk said she will ask around and find out what's going on but until then we were stuck with using VRI.  Ms. Kindred asked to speak with administrator of the language department.  She was informed that they were getting someone from that department and that in the meantime, Ms., Kindred need to continue using the VRI.

49. Later, they sent in a lady who hardly knew ASL. Ms. Kindred told the lady that what she was doing is illegal because she was not certified or qualified to interpret.  Ms. Kindred wanted a certified and qualified ASL interpreter.  As a result, IHC staff gave Ms. Kindred VRI again. Unfortunately, the VRI was blurry and constantly disconnecting on us. When they finally connected back with the VRI, we had had to start the meeting all over with the doctor with the VRI ASL interpreter repeatedly asking Ms. Kindred again what her name was, who was the doctor, who's in the room and other relevant information.

50. The IHC Language Administrator finally showed up and apologized profusely and said that he cannot request a last minute interpreter.  Ms. Kindred explained her request was not a last minute request because she requested a live onsite ASL interpreter two weeks prior to the surgery on December 21st, 2017 and she specifically asked for a live ASL interpreter and specifically stated that she did not want VRI.

51. Ms., Kindred went and found the IHC staff member that she made the request for onsite ASL interpreter from a few weeks ago. Ms. Kindred asked her if she remembers Ms. Kindred asking for a live onsite interpreter and the IHC staff member said she remembers Ms. Kindred's request and stated that she did send on the request to other

_____

not only as patients, but also as companions to patients who are seeking treatment. 28 C.F.R. § 36.303(c)(1).

staff members to set up the appointment for a live onsite ASL interpreter. When the IHC Language Administrator was told that the IHC staff member did receive Ms. Kindred's request and that she pass her request on to the relevant IHC staff member to schedule the live onsite ASL interpreter, the Administrator said he will try his best to get an interpreter for tomorrow, but he told me that he will not get one today which is when the surgery was scheduled to occur.

52. Having been denied a live onsite ASL interpreter that she requested two weeks prior to the surgery, Ms. Kindred had no choice but to use VRI that day. Unfortunately, Ms. Kindred ultimately ended up having to interpret for her husband and ex-husband because the VRI eventually stopped working and the because the doctor also got impatient with the VRI and stated that he wanted to move on.

53. Having Ms. Kindred interpret was extremely stressful for everyone, including the doctors and her mother because Ms. Kindred's mother asked a lot of questions which caused the doctor to repeat the questions to Ms. Kindred because she couldn't understand what her own mother was asking. Ms. Kindred is Deaf, and she couldn't catch everything that everyone else was saying.

54. Eventually, everyone was ready for Ms. Kindred's daughter to have her neck surgery.  Ms. Kindred told them she still wanted a live onsite ASL interpreter for when the doctor is finished with the surgery because that's the most critical time when the doctor gives critical information regarding her daughter's care and recovery.

55. They took her daughter to the operating room and she was told by IHC staff that they would get a live onsite ASL interpreter for her. An ASL interpreter by the name of Jackie arrived and Ms. Kindred learned that the assigned the ASL interpreter to be at

15

the hospital for 2 hours, until 1 PM. This angered Ms. Kindred because her daughter's surgery wasn't scheduled to finished until an hour after the ASL interpreter had to leave.

56. Ms. Kindred flew to the front desk at the hospital and asked her if there was another interpreter coming. They told her no. She demanded to talk to the language department, and luckily for Ms. Kindred, Jackie knew where it was.  We walked over to the language department and no was there. Ms. Kindred inquired as to when the individual working at the language department that the person would return any minute now. Ms. Kindred sat down on a chair and said, "I'll wait".

57. The Language Administrator showed up about 15 minutes later and apologized to Ms. Kindred and was in tears. Everyone went into the Administrator's room and she was talking about how a pipe in her house has burst and that she was having a really bad day. The Administrator told Ms. Kindred that she was a certified interpreter as well and apologized that she forgot to order me an interpreter.  The Administrator told Ms. Kindred that she called for an ASL interpreter on same the day Ms. Kindred requested an onsite interpreter, but the line was busy. The Administrator said she was going to call them back, but she then forgot. She bawled and cried.   Ms. Kindred sat there in shock. The Administrator promised Ms. Kindred will have an interpreter for the rest of my time there, starting the next day.

58. The following day, an ASL interpreter was provided to Ms. Kindred and her family but they were all disappointed because they didn't get an ASL interpreter on the day they really needed one which was for her daughter's surgery and after the surgery when the doctor would give the family instructions on how to care for Ms. Kindred's daughter after the back surgery.

16

59. On January 15th, 2019, Ms. Kindred sent a letter to the Civil Rights Section of the United States Department of Justice complaining about not being provided effective communication at the Primary Children's Hospital. (See Exhibit #4)

60. On February 8th, 2019 Ms. Kindred received a letter from the Department of Justice regarding her complaint towards the Defendants stating that they will take no further action on her complaint. (See Exhibit #5)

## McCALL SCADLOCK

61. McCall Scadlock contacted the Intermountain Health Care (IHC) clinic in Lehi to request an ASL interpreter for an on November 30th, 2018 for a medical appointment that was scheduled two weeks in advance. The appointment was scheduled on December 14th, 2018 at 8:30 AM. When she called to request an ASL interpreter, she called using a Videophone. Ms. Scadlock spoke with an IHC operator and I asked the operator if I can have an interpreter for my appointment. She told me "no, we do not provide for live interpreters, we do however have VRI." Ms. Scadlock replied that she would rather have a live interpreter at the appointment again a second time, and the IHC operator said "we don't do that, but we will see you in two weeks" and then made sure Ms. Scadlock understood the time and date of the appointment and hung up.

62. Ms. Scadlock posted on Facebook on December 12, 2018 seeking help in finding an ASL interpreter for her December 14th, 2018 appointment.[4] (See Exhibit # 6).



63. Two weeks later, on December 14th, 2018, Ms. Scadlock went to the appointment and she asked IHC staff if she will have a live interpreter and an IHC staff member said "No, but we have VRI." During the appointment, the VRI interpreter on the screen was turned sideways and I couldn't fully see the interpreter on the screen. Additionally, throughout the appointment the VRI often froze and then would work again temporarily, when the staff would leave the room, they would hang up the VRI and then

---

[4] Scadlock, Macall Facebook. December 12, 2018.
https://www.facebook.com/mccall.m.scadlock/posts/10212391943897023?notif_id=1544656244311600&notif_t=comment_mention. Accessed on June 24, 2019.

when they get back into the room, they would set it up again. This was annoying because each time they would call again, we were back to where we started with the appointment each time, making the appointment be longer than it should have been.

64. After the appointment, Ms. Scadlock had to schedule a 2nd appointment in three weeks in advance on January 7th, 2019 to see Dr. J. Thaddaeus Abbott at the Allergy and Asthma department at the Lehi Clinic. Ms. Scadlock made a request for a live onsite interpreter for the upcoming appointment and the nurse replied, "we do not know of any companies that we can use for live Interpreters." Ms. Scadlock kindly replied, "I know of three different interpreting companies" and she wrote down the names of the companies and their phone number and gave it to the nurse.

65. On January 6th, 2019 appointment, Ms. Scadlock called to confirm if they have scheduled a live interpreter for her appointment on the next day of January 7th, 2019, but they didn't give her a response to that question.

66. On the following day, Ms. Scadlock went to her appointment with Dr. J Thaddaeus Abbott and was expecting an ASL interpreter to show up onsite. Ms. Scadlock approached the front desk and the asked about if a live ASL interpreter would be showing up on site, and the woman at the desk replied by asking "do you need a VRI?" Ms. Scadlock replied, "no, I am expecting a live interpreter." She responded back saying "well, the interpreter cannot be a friend…" This statement was something Ms. Scadlock knew was true and she told the receptionist that "it will be someone I don't know at all."

67. While waiting in the waiting room, people who came after Ms. Scadlock were getting called and she waited over an hour until finally a live onsite ASL interpreter showed up. The ASL interpreter explained to Ms. Scadlock that she was at a previous appointment

that was at 7:30 am and was supposed to go until 10:30am but the customer never showed up, within the time of her getting ready to leave, she got a call from the clinic five minutes after  just leaving her first appointment, saying they needed someone to come in and interpret for a hearing impaired patient."  Ms. Scadlock was in shock, because IHC staff acted like they had set up the appointment with the interpreter days in advance. But from what Ms. Scadlock was told by the interpreter, what IHC told Ms. Scadlock was a stone cold lie.

68. Ms. Scadlock was set to have another appointment at in a few weeks with Dr. Abbott on January 17th, 2917 and requested an ASL interpreter for that appointment.

69. On January 15th, 2019, Ms. Scadlock sent a letter to the Civil Rights Section of the United States Department of Justice complaining about not being provided effective communication at The Lehi Clinic and Instacare. (See Exhibit #7) On April 16th, 2019, the Department of Justice sent Ms. Scadlock and informed her that they would not be taking any further action on her complaint and carefully explained that they had made no determination on the merits of her complaint.

70. Ms. Scadlock was not provided an ASL interpreter for her January 17th, 2019 appointment despite specifically asking for an ASL interpreter in advance of her appointment. She was provided with VRI instead at that appointment. Ms. Scadlock was set to have another appointment at in a few weeks with Dr. Abbott on February 4th, 2019 and requested an ASL interpreter for that appointment.

71. Finally, Ms. Scadlock was provided an ASL interpreter for her February 4th, 2019 for her appointment with Dr. Abbott that day. Ms. Scadlock was relieved that her requests for ASL interpreter was honored and granted to her.

20

## DEFENDANTS' PATTERN OF DISCRIMINATION WAS INTENTIONAL

72. Ms. Scadlock and Ms. Kindred are qualified individuals with a disability as defined by the ADA, Rehabilitation Act and the ACA.

73. Starting April 3rd, 2017 Defendants engaged in a pattern of intentional discrimination against Ms. Kindred by reason of her disability of being Deaf by not providing her an ASL interpreter in when requested two weeks in advance of her daughter's surgery.

74. The Defendants continued to discriminate against Ashley Kindred by reason of her disability of being Deaf by not providing her an ASL interpreter in when requested two weeks in advance of her daughter's surgery on December 21st, 2017.

75. Ms. Kindred asked the Defendants for a live onsite ASL interpreter a few weeks in advance of her daughter's scheduled medical surgery on December 21st, 2017 and her request was either forgotten or denied. Ms. Kindred, along with other deaf relatives of the minor child, must be provided with effective communication.[5]

76. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate communication."[6] It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.[7]

77. The VRI provided to Ms. Kindred on December 21st, 2017 was not functioning

---

[5] Deaf persons are protected by the Americans with Disabilities Act, Rehabilitation Act and the Affordable Care Act not only as patients, but also as companions to patients who are seeking treatment. 28 C.F.R. § 36.303(c)(1).
[6] 28 C.F.R § 35.160(c)(1-3) (Title II) and 28 C.F.R § 36.303(a-c) (Title III).
[7]   28 C.F.R § 35.104 "Qualified interpreter" (Title II) and 28 C.F.R § 36.104 "Qualified interpreter" (Title III). See also Utah Code §35A-13-611 (Interpreter Services for the Deaf and Hard of Hearing Act)

properly as to provide effective communication to Ms. Kindred or other family members. Under the ADA, it is illegal to have VRI service that is not functioning properly.[8]

78. Starting November 30th, 2018 Defendants engaged in a pattern of intentional dissemination against Ms. Scadlock by reason of her disability of being Deaf in advance of her medical appointment.

79. Ms. Scadlock asked the Defendants for a live onsite ASL interpreter a few weeks in advance of her doctor's appointment on December 14th, 2018. Unfortunately, a live onsite ASL interpreter was not provided and Ms. Scadlock was given VRI that did not function properly.[9]

80. Ms. Scadlock asked the Defendants for a live onsite ASL interpreter a few weeks in advance of her doctor's appointment with Dr. J Thaddaeus Abbott on January 7th, 2019 at the Lehi Clinic and Instacare. Unfortunately, a live onsite ASL interpreter was provided only because an ASL interpreter was present at the clinic for another appointment that did not show up.

81. Finally, Ms. Scadlock was provided an ASL interpreter for her February 4th, 2019 for her appointment with Dr. Abbott that day.

82. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

83. Defendants were aware that refusing or not providing a live onsite ASL interpreter as requested a few weeks before the Plaintiff's scheduled medical

---

[8] 28 C.F.R § 35.160(d)(1-4) (Title II) and 28 C.F.R § 36.303(f)(1-4) (Title III).
[9] Id.

appointment violated their federally protected rights.

84. Defendants were aware that allowing Ms. Kindred to be an interpreter to other family members violated Ms. Kindred's federally protected rights

85. Defendants were aware that providing defective VRI to the Plaintiffs violated their federally protected rights.

86. It was not an undue financial burden for Defendants to provide Ms. Kindred and Ms. Scadlock with a live onsite ASL interpreter for effective communication when it was requested a few weeks in advanced of their medical appointment.

87. It would not fundamentally alter Defendants' services to provide an onsite ASL interpreter for the Plaintiffs for effective communication.

88. Defendants decision to deny the Plaintiffs an ASL interpreter as requested a few weeks before the Plaintiff's scheduled medical appointment was intentional and/or negligent. There can be no more critical place in which a person is entitled to equal protection and equal participation than in the healthcare setting because decisions are made in medical facilities that may make a difference between life and death for a patient. For a patient with a hearing loss, a breakdown in communication between a medical provider and the patient can be fatal.[10] Unfortunately, only 17% of Deaf signers receive an interpreter in healthcare settings.[11]

89. Defendants did not provide equal services to the Plaintiffs like it did for hearing

---

[10] Otis, Ginger Adams. "Hospitals' failure to provide interpreter for deaf man led to his death, suit claims" Published on May 26, 2015. http://www.nydailynews.com/new-york/bronx/exclusive-deaf-man-died-hospitals-failed-suit-article-1.2235239 Accessed on March 18, 2018.

[11] Alexander, A., Ladd, P., & Powell, S. (2012). *Deafness might damage your health*. Lancet, 379(9820), 979–981. doi:10.1016/S0140-6736(11)61670-X as cited in Pertz, L., Plegue, M., Diehl, K., Zazove, P., & McKee, M. (2018). *Addressing mental health needs for deaf patients through an integrated health care model*. Journal of Deaf Studies and Deaf Education, 23, 240-248. doi: 10.1093/deafed/eny002

patients.

90. Defendants did not provide equal services for the Plaintiffs because of their disability of being Deaf.

91. Because of Defendants' intentional discrimination, the Plaintiffs suffered and continues to suffer severe emotional pain.

92. Because of Defendants' intentional discrimination, Ms. Scadlock suffered and continues to suffer severe emotional pain.

93. Finally, the Defendants' pattern of discrimination towards Deaf patients in Utah by failing to provide effective communication is ongoing and intentional since it currently facing another lawsuit where Deaf plaintiffs have alleged that the Defendants failed to provide effective communications on separate occasions starting in July of 2015. (See *Johnston et al v. Intermountain Healthcare et al,* 1:18-cv-00003-DN-DBP).

94. The record is clear that Defendants refused to provide effective communication to patients with a hearing loss and could not communicate as effectively as they could have with hearing patients. Thus, the Defendants, with deliberate and egregious indifference, deliberately failed to ensure that they could comply with their obligations under the Americans with Disabilities Act, the Rehabilitation Act and the Patient Protection and Affordable Care Act (ACA).

95. For Ms. Scadlock and Ms. Kindred, their own record shows that Defendants failed to provide in person qualified ASL interpreters despite Plaintiffs' many requests. Defendants were put on notice of the needs of Plaintiffs on countless occasions during the course of Plaintiffs' medical treatment.

## FIRST CAUSE OF ACTION
(Injunction and Damages for Violation of Title III of the ADA for excluding from

participation in or denying the benefits of the services, programs, or activities of a public entity)

96.     The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 95 hereof, and incorporate the same herein by reference.

97.     Plaintiffs Ms. Scadlock and Ms. Kindred are qualified individuals with a disability as defined by the ADA and were subjected to intentional discrimination at the hands of Intermountain Healthcare and their employees and agents by reason of the Plaintiffs' disabilities.

98.     The Defendants discriminated against the Plaintiffs because of their disability by failing to, or refusing to, provide a qualified and certified American Sign Language Interpreter upon request in connection during their medical visits to the Primary Children's Hospital and/or the Lehi Clinic and Instacare which are both operated by Intermountain Healthcare.

99.     The ADA places a positive duty on Intermountain Healthcare and other similar medical organizations that lease and operate public places of accommodation and that provide services to the public, to assure that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation." §28 CFR 36.201.

100.     The Defendants' failure to obtain a qualified and certified American Sign Language Interpreter was a "denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." §28 CFR 36.202(a).

101. Both Plaintiffs asked the Defendants for a live onsite ASL interpreter a few weeks in advance of their medical appointment and their request was either forgotten or denied.

102. In one instance, an individual came to interpret for Ms. Scadlock even though she was not certified or qualified to interpret.

103. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate communication." It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.

104. The VRI provided to the Plaintiffs for their medical appointments was not functioning properly as to provide effective communication to the Plaintiffs.

105. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

106. The acts or omissions of the Defendants (or their agents) caused the Plaintiffs to suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by the Plaintiff relating to the Defendants' discrimination are ongoing until the discriminatory conditions are corrected by preliminary and permanent injunctions, enjoining the Defendants from further violations of the ADA.

107.    Because the Plaintiffs, Ms. Scadlock and Ms. Kindered was injured and suffered from severe emotional distress (much more than a typical person could be expected to endure) and they are entitled to compensation for such injuries.

108.    Furthermore, the Plaintiffs suffered actual financial loss arising from hiring an attorney and spending time, money and resources to collect information and to obtain a resolution in this case.

109.    The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs. §28 CFR 36.505.

## SECOND CAUSE OF ACTION
(Violation of Title III, ADA–Disparate Treatment by Reason of Disability)

110.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 109 hereof, and incorporates the same herein by reference.

111.    The Defendants have engaged in discrimination by segregating, singling out or subjecting the Plaintiffs to disparate treatment by reason of their Deafness.

112. Both Plaintiffs asked the Defendants for a live onsite ASL interpreter a few weeks in advance of their medical appointment and their request was either forgotten or denied.

113. In one instance, an individual came to interpret for Ms. Scadlock even though she was not certified or qualified to interpret.

114. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate communication." It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.

115. The VRI provided to the Plaintiffs for their medical appointments was not functioning properly as to provide effective communication to the Plaintiffs.

116. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

117. Defendants did not provide equal services to the Plaintiffs like it did for hearing patients.

118. Defendants did not provide equal services for the Plaintiffs because of their disability of being Deaf.

119. Due to the discriminatory policies, practices and procedures at Intermountain Healthcare, Primary Children's Hospital and the Lehi Clinic and Instacare, the Defendants' excluded, denied services to, segregated, or otherwise treated differently the Plaintiffs by reason of their disabilities.

120. The Plaintiffs were, and are, subjected to discriminatory conditions and suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity interests.

121. This real and tangible injury has caused the Plaintiffs, Mr. and Mrs. Johnston, to incur costs in the form of fees and interest from their personal funds to travel to meet with their attorney, funds which they would not have otherwise had to spend had the Defendants refused to provide a certified and certified ASL interpreter by reason of their Deafness.

122. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiff's much-cherished independence.

The injuries sustained by the Plaintiff's relating to the discrimination at the Defendants' hands are ongoing until the discriminatory conditions are corrected by policy and the source of the affront and indignity is rectified.

123.    The Plaintiff have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs.  §28 CFR 36.505.

### THIRD CAUSE OF ACTION
(Violation of Title III, ADA–Discriminatory Policies, Practices and Procedures)

124.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 hereof, and incorporate the same herein by reference.

125.    Defendants engaged in discrimination by failing to modify their policies, practices, and procedures to ensure equal access to persons who are Deaf. As a result, by imposition or application of eligibility criteria that screen out, or tend to screen out, individuals with disabilities, specifically individuals who are Deaf, from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations including access to effective communication based on the needs of the individual and not a generalized assumption about a community.

126.    Furthermore, the Defendants discriminated by refusing to provide a certified and qualified ASL interpreter. As a result, they engaged in illegal administrative procedures towards Plaintiffs.

127. Both Plaintiffs asked the Defendants for a live onsite ASL interpreter a few weeks in advance of their medical appointment and their request was either forgotten or denied.

128. In one instance, an individual came to interpret for Ms. Scadlock even though she was not certified or qualified to interpret.

29

129. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate communication." It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.

130. The VRI provided to the Plaintiffs for their medical appointments was not functioning properly as to provide effective communication to the Plaintiffs.

131. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

132.   By policies, practices and procedures, the Defendants failed or refused to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities.

133.   Because of the Plaintiffs' disability, the Defendants denied them the ability to fully and equally participate in obtaining medical services from the Defendants that other non-disabled patients receive due to the Defendants' discriminatory behavior and practices.

134.   The Plaintiffs' was, and are, still being subjected to the discriminatory conditions and suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests.

135.   This real and tangible injury has caused the Plaintiffs, Mr. and Mrs. Johnston to incur costs in the form of fees and interest from their personal funds to travel

to meet with their attorney, funds which they would not have otherwise had to spend had the Defendants refused to provide a certified and certified ASL interpreter by reason of their Deafness.

136.    Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by the Plaintiffs relating to the discrimination at the Defendants' place of public accommodation are ongoing until the discriminatory conditions are corrected by granting the access required by law.

137.    The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of attorney's fees and costs. §28 CFR 36.505.

## FOURTH CAUSE OF ACTION
(Injunction and Damages for Violation of Title III, ADA–Discriminatory Administrative Methods)

138.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 137 hereof, and incorporate the same herein by reference.

139.    The Defendants engaged in discrimination by maintaining discriminatory and illegal administrative methods.  The Defendants discriminate by excluding people with disabilities.  Defendants have not taken such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals.

140.    Defendants have not properly trained employees as to the requirements for affording effective communication under the ADA.

141.    Because of the disability of deafness, the Plaintiffs cannot fully and equally access the services offered by the Defendant.  The Plaintiffs are regularly subjected to

such discrimination and their opportunities are unfairly limited when businesses effectively ban them because of their disabilities.

142.    The Plaintiffs are subjected to the discriminatory conditions present at Primary Children's Hospital and the Lehi Clinic and Instacare which are owned, leased and operated by Intermountain Healthcare. The Plaintiffs have suffered irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity and interests.

143.    Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much cherished independence. The injuries sustained by the Plaintiffs relating to the discrimination at the Defendants' places of public accommodation are ongoing until the discriminatory conditions are corrected by either granting the access required by law or removing or shutting down the source of the affront and indignity.

144.    The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs. §28 CFR 36.505.

### FIFTH CAUSE OF ACTION
(Injunction and Damages for Violation of Section 504 of the Rehabilitation Act)

145.    The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 144 hereof, and incorporate the same herein by reference.

146.    The Defendants are subject to requirements of section 504 because they receive federal funds to support services or programs.

147.    The Plaintiffs are qualified individuals with a disability as defined by Section 504 of the Rehabilitation Act and is subjected to discrimination because they are individuals with a disability. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. §

12102). The Plaintiffs were qualified to participate in Defendant's aids, benefits, and services within the meaning of Section 504.

148.   Defendants discriminated against the Plaintiffs because they are individuals who are Deaf and also by refusing to provide ASL interpreters which could not establish effective communication with the Defendants.

149. Both Plaintiffs asked the Defendants for a live onsite ASL interpreter a few weeks in advance of their medical appointment and their request was either forgotten or denied.

150. In one instance, an individual came to interpret for Ms. Scadlock even though she was not certified or qualified to interpret.

151. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate communication." It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.

152. The VRI provided to the Plaintiffs for their medical appointments was not functioning properly as to provide effective communication to the Plaintiffs.

153. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

154.   The Staff and Administrators, in all instances, individually and acting Defendants' agents, denied the Plaintiff's request to for an ASL interpreter.   They discriminated against them intentionally, recklessly and with malicious disregard for the

Plaintiffs federally protected rights, because they are Deaf individuals.

155. The acts or omissions of Defendants (or its agents) caused the Plaintiffs to suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity interests. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much-cherished independence. The injuries sustained by Plaintiffs relating to the Defendants' discrimination are ongoing until the discriminatory conditions are corrected by preliminary and permanent injunctions, enjoining the Defendants from further violations of Section 504.

156.   Because the Plaintiffs are injured by the intentional acts of the Defendants and suffered from severe emotional distress (much more than a typical person could be expected to endure) they are entitled to compensation for such injuries.

157.   Furthermore, the Plaintiffs suffered actual financial loss by spending personal funds to travel to meet with their attorney which he would not have otherwise had to spend had the Defendants provided a live and in person ASL interpreter upon request.

158.   The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs.

## SIXTH CAUSE OF ACTION
(Injunction and Damages for Violation of The Patient Protection and Affordable Care Act (ACA))

159. The allegations in paragraphs 1-158 above and the below are incorporated herein by reference.

160.   The Defendants are subject to requirements of The Patient Protection and

Affordable Care Act (ACA) because they receive federal funds to support services and/or programs, including, but is not limited to, Meaningful Use funds or Medicaid funds.

161.   The Plaintiffs are qualified individuals with a disability as defined by the Section 504 of the Rehabilitation Act, and is subjected to discrimination because they are individuals with a disability.

162. Section 1557 of the Patient Protection and Affordable Care Act (ACA), ensures that an individual is not excluded from participating in, denied benefits because of, or subjected to discrimination as prohibited under Section 504 of the Rehabilitation Act of 1973 (disability), under any health program or activity, any part of which is receiving federal financial assistance, or under any program or activity that is administered by an Executive Agency or any entity established under Title I of the Affordable Care Act or its amendments. 42 USC 18116(a).

163.   Defendants discriminated against the Plaintiffs because they are Deaf individuals and refused to provide ASL interpreters to establish effective communication with the Defendants.

164. Both Plaintiffs asked the Defendants for a live onsite ASL interpreter a few weeks in advance of their medical appointment and their request was either forgotten or denied.

165. In one instance, an individual came to interpret for Ms. Scadlock even though she was not certified or qualified to interpret.

166. Ms. Kindred had to interpret for her family members during her daughter's surgery on December 21st, 2017. Under the ADA, it is illegal for a public accommodation to rely on an "adult accompanying an individual with a disability to interpret or facilitate

communication." It is illegal for Ms. Kindred for her family since she is not a qualified or certified ASL interpreter.

167. The VRI provided to the Plaintiffs for their medical appointments was not functioning properly as to provide effective communication to the Plaintiffs.

168. Defendants never completed an individualized analysis of Ms. Kindred or Ms. Scadlock's disability to determine a reasonable accommodation for effective communication.

169. The Defendants failed to establish, within their agencies and divisions, policies, practices, and procedures required under The Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18001 et seq. to ensure that persons who are Deaf are not subjected to discrimination.

170. Section 1557 requires covered entities to give "primary consideration" to the person with a disability's choice of auxiliary aid or service. 81 Fed. Reg. 31421. Auxiliary aids and services can include, as appropriate, qualified interpreters, a variety of assistive technology devices, and the provision of materials in alternative formats. 45 C.F.R. § 92.4.

171. All covered entities, regardless of the number of employees, must provide appropriate auxiliary aids and services to people with impaired sensory, manual, or speaking skills, where necessary to afford those individuals an equal opportunity to benefit from the health program or activity. 45 C.F.R. § 92.202(b).

172. The Staff and Administrators, in all instances, individually and acting Defendants' agents, denied the Plaintiff's request to for an ASL interpreter. They discriminated against them intentionally, recklessly and with malicious disregard for the Plaintiffs' federally protected rights, because they are Deaf individuals.

36

173. The acts or omissions of Defendants (or its agents) caused the Plaintiffs to suffer irreparable harm in the nature of humiliation, limitation of freedom, and other forms of intangible injuries to their dignity interests. Each of the discriminatory conditions identified above presents a palpable and substantial deprivation of a degree of the Plaintiffs' much-cherished independence. The injuries sustained by Plaintiff relating to the Defendants' discrimination are ongoing until the discriminatory conditions are corrected by preliminary and permanent injunctions, enjoining the Defendants from further violations of The Patient Protection and Affordable Care Act (ACA).

174. Because Plaintiffs' are injured by the intentional acts of the Defendants and suffered from severe emotional distress (much more than a typical person could be expected to endure) they are entitled to compensation for such injuries.

175. Furthermore, the Plaintiffs suffered actual financial loss by spending personal funds to travel to meet with their attorney which they would not have otherwise had to spend had the Defendants not prevented them from communicating with their doctors via a certified and qualified ASL interpreter by reason of their Deafness.

176. The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs.

## SEVENTH CAUSE OF ACTION
### (Professional Negligence)

177. The allegations in paragraphs 1-176 above and the below are incorporated herein by reference.

178. Defendants owed the Plaintiff a duty to exercise reasonable care and diligence to assure provide effective communication to the Plaintiffs who are Deaf.

179. The duties that the defendants owed to the Plaintiff include, but are not limited

37

to:

a. Assure that the Plaintiffs were provided with an American Sign Language interpreter at all of their medical visits with the Defendants;

b. Assure that live onsite ASL interpreters are qualified and certified to interpret for Deaf patients;

c. Assure that medical facilities do not rely on an adult accompanying an individual with a disability to interpret or facilitate communication;

d. Assure that companions accompanying a Deaf patient are provided with a certified and qualified ASL interpreter to help the Deaf patient understand any and all medical procedures that they, or their children, were required to undergo;

e. Assure that the VRI provided to patients with a hearing loss for their medical appointments are functioning properly as to provide effective communication to the Plaintiffs;

f. Assure that medical facilities complete an individualized analysis of the patient's hearing disability to determine a reasonable accommodation for effective communication;

g. To comply with all state and federal antidiscrimination laws requiring place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation to provide effective communication to a patient with a hearing loss.

180. The Plaintiffs have suffered damages as a result of the Defendants' negligence.

181. The Plaintiffs have been forced to engage the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs.

## EIGHTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

182. The Plaintiffs hereby incorporates the allegations in paragraphs 1 to 180 as if fully set forth herein.

183. Outrageous Conduct claims are described as causing an average member of the community would view the conduct and exclaim, "Outrageous!" *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381 (10th Cir. 1988); *Nelson v. Target Corporation*, 334 P.3d 1010 (Utah App. 2014) *Anderson Development Company v. Tobias*, et al, 116 P.3d 323 (Utah 2005).

184. Outrageous Conduct claims are available when a defendant engages in extreme and outrageous conduct, either recklessly or with the intent of causing the plaintiff severe emotional distress, and when the plaintiff incurred severe emotional distress caused by a defendant's conduct.

185. Defendants were aware that the Plaintiffs were Deaf and intentionally discriminated against them by refusing to provide them equal access to its facilities and services and despite the fact that a request for a live onsite ASL interpreter was made weeks prior to the scheduled medical appointment.

186. Medical professionals employed by Defendants could see that the VRI was not operating properly at medical appointments for the Plaintiffs. At one appointment, the lack of a functioning VRI caused one of the Plaintiffs to interpret for her family members so that they could understand the medical facts surrounding the minor child's surgery and, as such, were aware that its decision to deny the Plaintiffs equal access was discrimination, and that such discrimination caused the Plaintiffs severe emotional distress.

39

187. The Defendants refused to provide effective communication to the Plaintiffs and the Plaintiffs could not communicate as effectively as they could have with hearing patients. Thus, The Defendants, with deliberate and egregious indifference, deliberately failed to ensure that they could comply with their obligations under the Americans with Disabilities Act, the Rehabilitation Act and the Patient Protection and Affordable Care Act (ACA).

188. Defendant's conduct was carried out with wanton, conscious, reckless, and outrageous disregard for Ms. Mullen's civil rights, mental health, and welfare.

189. Defendants outrageous conduct has directly and proximately caused the Plaintiff's injury and they are entitled to damages and relief to the fullest extent permitted by law and according to proof at trial.

### *Prayer for Relief*

### On the Plaintiff's First Cause of Action:

(a) That this court exercise jurisdiction over this entire action;

(b) That this Court declare that the actions and failures to act of Defendants, including agencies, employees, and agents, violated the Americans with Disabilities Act's mandate to refrain from excluding "from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity" by reason of their deafness;

(c) For an order requiring the Defendant to adopt a comprehensive policy regarding communication access for members of the public who are Deaf and Hard of Hearing. If such a policy exists, an order requiring the administration to train its staff and agents including any Officers of the Law in the application of such a policy;

(d) For an order requiring the Defendants to compensate the Plaintiffs for actual losses and the substantial emotional distress the Defendants' actions caused to Ms. Kindred and Ms. Scadlock;

(e) For an order awarding the costs of this action and reasonable attorney's fees to Plaintiffs Ms. Scadlock and Ms. Kindred, and;

(f) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

### On their Second Cause of Action:

(a) For a declaration that the Defendants are in violation of the ADA and for a permanent injunction enjoining each Defendants, Defendants' agents, employees and assigns from discrimination and disparate treatment on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring the Defendants to adopt policies, practices and procedures that are fully compliant with the Americans with Disabilities Act;

(b) For an order requiring the Defendants to change their discriminatory policies, practices and procedures in order to ensure that individuals who are deaf are not discriminated against by staff, employees and agents and to ensure that people who are Deaf are actively accommodated in ways that afford them full participation in medical services and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation

expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

## On their Third Cause of Action:

(a) For a declaration that the Defendants is in violation of the ADA and for a permanent injunction enjoining each Defendant, Defendants' agents, employees and assigns from discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring Defendants to cease policies, practices and procedures that are not fully compliant with the Americans with Disabilities Act;

(b) For an order requiring the Defendants to change their discriminatory administrative methods in order to assure that individuals who are Deaf are not discriminated against by staff, employees and agents by allowing persons who are Deaf to participate in medical services and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

## On their Fourth Cause of Action:

(a) For a declaration that the Defendants are in violation of the ADA and for a

permanent injunction enjoining each Defendants, Defendants' agents, employees and assigns from discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act; and specifically requiring Defendants to cease all policies, practices and procedures that are not fully compliant with the Americans with Disabilities Act;

(b) For an order requiring the Defendants to change their discriminatory administrative methods in order to ensure that individuals who are Deaf are not discriminated against by staff, employees and agents by allowing persons who are Deaf to participate in medical events and activities in a manner that is equal to that afforded persons without disabilities;

(c) For actual costs and compensatory damages for injuries caused by the Defendants' failure or refusal to comply with federal law;

(d) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation expenses, and costs of suit; and

(e) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

### On the Fifth Cause of Action:

(a) That this Court declare that the Defendants, Intermountain Healthcare, Primary Children's Hospital, the Lehi Clinic and Instacare and ASL Communications are subject to the requirements of section 504 of the Rehabilitation Act.

(b) That actions and failures to act of Defendants, including agencies employees and agents, violated Section 504's mandate "from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity" by reason

of their deafness;

(c) For an order requiring the Defendant to adopt a comprehensive policy regarding communication access for communication with members of the public who are Deaf and hard of hearing based on the needs of the individual members of the public. If such a policy exists, an order requiring the administration to train staff and agents in the application of such a policy;

(d) For actual costs and compensatory damages caused by the Defendants' failure or refusal to comply with federal law;

(e) For the Plaintiff's attorney's fees, including litigation expenses, and costs of suit; and;

(f) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

## On their Sixth Cause of Action:

(a) That this Court declare that the Defendants, Intermountain Healthcare, Primary Children's Hospital, the Lehi Clinic and Instacare and ASL Communications are subject to the requirements of section The Patient Protection and Affordable Care Act (ACA).

(b) That actions and failures to act of the Defendants, including agencies employees and agents, violated the ACA's mandate that individuals with disabilities shall not be excluded from participating in, denied benefits because of, or subjected to discrimination as prohibited under Section 504 of the Rehabilitation Act of 1973 (disability), under any health program or activity, any part of which is receiving federal financial assistance, or under any program or activity that is administered by an Executive

44

Agency or any entity established under Title I of the Affordable Care Act or its amendments. 42 USC 18116(a).

(c) For an order requiring the Defendants to adopt a comprehensive policy regarding communication access for communication with members of the public who are Deaf and hard of hearing based on the needs of the individual members of the public. If such a policy exists, an order requiring the administration to train staff and agents in the application of such a policy;

(d) For actual costs and compensatory damages caused by the Defendants' failure or refusal to comply with federal law;

(e) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation expenses, and costs of suit; and

(f) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

## <u>On their Seventh Cause of Action:</u>

(a) For a declaration that the Defendants have engaged in professional negligence by breaching the duty owed to the Plaintiff by failing to provide effective communications for a patient who is deaf or hearing impaired.

(b) For actual costs and compensatory damages for injuries caused by actual and proximate cause of the Defendant's breach of duty owed to the Plaintiff.

(c) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation expenses, and costs of suit; and

(d) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

## On their Eighth Cause of Action:

(a) For a declaration that the Defendants have engaged in Intentional Infliction of Emotional Distress by engaging in extreme and outrageous conduct, either recklessly or with the intent of causing the plaintiff severe emotional distress, and when the plaintiff incurred severe emotional distress caused by a defendant's conduct by failing to provide effective communications for a patient who is deaf or hearing impaired.

(b) For actual costs and compensatory damages for injuries caused by actual and proximate cause of the Defendant's breach of duty owed to the Plaintiff.

(c) For the Plaintiffs, Ms. Kindred and Ms. Scadlock's legal fees, including litigation expenses, and costs of suit; and

(d) For such other and further relief (both under law and under the Court's broad equitable jurisdiction) deemed appropriate by the Court.

/s/: Jared Allebest
Jared Allebest, #13485
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served this 5th day of August 2019, by electronic notice to:

Intermountain Healthcare
Corporate and Executive Offices
36 South State Street
Salt Lake City, Utah 84111

Primary Children's Hospital
Mario Capecchi Dr,
Salt Lake City, Utah 84113

The Lehi Clinic and Instacare
3249 North 1200 West
Lehi, Utah 84043

ASL Communication
1149 W. 640 N.
Orem, Utah 84057

Christopher M. Glauser
Manning Curtis Bradshaw & Bednar, PLLC
136 E South Temple Ste 1300
Salt Lake City, UT 84111

David C. Castleberry
Manning Curtis Bradshaw & Bednar, PLLC
136 E. South Temple Ste 1300
Salt Lake City, UT 84111

Douglas D. Gerrard
Gerrard Cox & Larsen
2450 St. Rose Pkwy #200
Henderson, NV 89074

James E. Shapiro (Pro Hac Vice)
SMITH & SHAPIRO, PLLC
3333 E. Serene Ave., Suite 130
Henderson, Nevada 89074

/s/: Jared Allebest
Jared Allebest, #13485
Attorney for Plaintiffs
8978 South Quarry Stone Way
Sandy, UT 84094
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com